STATE OF NEBRASKA, EX REL. RALPH W. BRECKENRIDGE, V. WILLIAM FLEMING, TAX COMMISSIONER OF THE CITY OF OMAHA.

STATE OF NEBRASKA, EX REL. HENRY E. PALMER, V. WILLIAM FLEMING, TAX COMMISSIONER OF THE CITY OF OMAHA.

FILED DECEMBER 16, 1903.   Nos. 13,495, 13,496.

1. **Taxation**: FOREIGN CORPORATIONS. The state may impose such conditions and limitations as it sees fit upon foreign corporations seeking the privilege of doing business in this state.

2. **Revenue Law**: CONSTITUTIONALITY. A general revenue law will not be declared unconstitutional on account of discriminative provisions if such provisions may be rejected and the law enforced without them.

3. **Mandamus**: COURTS: LIMITATIONS. This court can not attempt, prior to an actual controversy arising, to direct the officers charged with the enforcement of a law relating to their duty in putting it in operation.

ORIGINAL applications for writs of mandamus to the tax commissioner of the city of Omaha. *Writs denied.*

*Charles J. Greene, Ralph W. Breckenridge, James C. Kinsler, John L. Webster* and *Timothy J. Mahoney,* for relator.

*Carl C. Wright, John M. Stewart, Thomas C. Munger, Leander M. Pemberton* and *Halleck F. Rose,* contra.

SULLIVAN, C. J.

The question to be decided in these cases is not whether particular provisions of chapter 73 of the laws of 1903 are valid or ideally just, but whether the act, considered as a

whole, is a constitutional expression of the legislative will. Objection is specially urged against those sections of the act defining the manner in which insurance companies are to be taxed, and it is said that the law discriminates against the property of foreign insurance companies and in favor of domestic corporations of that character. Relating to the provisions of sections 59 and 60, it is plain that the tax of 2 per cent. upon the gross earnings of the companies mentioned in these sections is a tax imposed, not upon their property, but upon their privilege of doing business in this state. That the state may impose such conditions and limitations upon foreign corporations seeking the privilege of conducting their business in this state as it sees fit, is not a question open to discussion. Such companies have no authority to transact business in this state without the consent of the state, and, when they seek the privilege, they must comply with the conditions imposed. After coming here, their property must be dealt with on terms of equality with the property of the citizen. It is subject to no further burden in the way of taxation than is imposed upon the resident, but, for the privilege of doing business here, they must submit to such conditions as the legislature sees fit to impose. *Philadelphia Fire Ass'n v. New York*, 119 U. S. 110; *Paul v. Virginia*, 8 Wall. (U. S.) 168; *Pembina Consolidated Silver Mining & Milling Co. v. Pennsylvania*, 125 U. S. 181; *Scottish Union & National Ins. Co. v. Herriott*, 109 Ia. 606. The tax complained of is not in any sense a tax upon the property of these corporations, but a privilege tax and, as such, is wholly unobjectionable.

Section 58 of the act relates to fire insurance companies organized under the laws of any other state or country and transacting business in this state. These companies are required to report the gross amount of premiums received by them, for insurance written upon property within the state, during the preceding year, and such gross receipts are to be taken as an item of property of that value, which is to be assessed and taxed on the same percentage as other

property.   Section 61 relates to life, fire or accident insurance, and surety companies organized under the laws of this state and doing business on the premium plan.   These companies are to report the gross amount of premiums received for all Nebraska business done within the state, during the preceding calendar year, less the amount ceded to other companies as reinsurance, through regularly authorized agents in this state, and less premiums returned on canceled policies; such gross receipts, less the deductions allowed, to be taken' as an item of property of that value, and assessed and taxed on the same percentage as other property.   It is claimed that the law, in so far as it allows the domestic companies to deduct from their gross receipts the amount paid for reinsurance and returned on canceled policies, discriminates in favor of the domestic company and imposes an undue burden upon the property of the foreign corporation.   Without, at this time, stopping to construe these two sections and determine their exact meaning, we are of opinion that the foreign companies, if discriminated against, may successfully contend that the discriminative provisions are invalid, and that the law must be enforced without them. Such companies can easily obtain redress in a proper proceeding, and, in any view of the matter, we are not, we think, required either by sound reason or legal necessity to declare the whole law unconstitutional.   It is not every defect in a law, and especially in a statute of this importance, devised for the purpose of producing revenue for the state, where the business of the state and of every municipality therein is at stake, that requires a court to declare the whole law inoperative and void, if, by proper proceedings, the citizen prejudiced by the operation of the law may secure redress.   It is far better that he should be required to take these proceedings than that the very life of the government should be imperiled.   This seems to be the current of authority.   The federal banking act allows the state authorities to tax the shares of national banks, "subject only to the two restrictions, that the taxation shall not be at a greater rate than

is assessed upon other moneyed capital in the hands of individual citizens of such state, and that the shares of any national banking association owned by nonresidents of any state shall be taxed in the city or town where the bank is located, and not elsewhere." Sec. 5219, 3 U. S. Compiled Statutes, p. 3502. The revenue laws of New York allowed parties in that state to deduct from the value of their personal property all just debts owing by them, but provided that no deduction should be made on account of debts from the value of national bank shares owned by the party. This law was sustained by the New York court of appeals, but the supreme court of the United States in *Supervisors v. Stanley,* 105 U. S. 305, held the law void so far as it refused the owner of national bank shares the same privilege extended to other owners of personal property, namely: to deduct their just indebtedness from the assessed value of such shares, but expressly held that the law was valid and enforceable in all of its other features, and that the illegal provision relating to the assessment of national bank shares did not have the effect of vitiating the whole law, as the complaining party might obtain redress by other proceedings. In *Levi v. City of Louisville,* 97 Ky. 394, it was held that, under the constitution of Kentucky, taxes on property must be by valuation. The city of Louisville, by an ordinance, had directed the levy of a valuation tax upon all real estate in the city, but imposed a license tax upon those owning personal property in lieu of the valuation tax imposed upon real estate. It was held that, while the license tax imposed upon personal property was invalid and not authorized, this did not have the effect to destroy the ordinance so far as it authorized the levy of a legal tax, and that those who were unjustly burdened by the operation of the ordinance might, in a proper proceeding, obtain the proper relief.

The constitution of Louisiana required a tax to be levied upon all movable and immovable property in the state, to pay interest becoming due annually on all bonds issued by the state. By an act of the legislature a tax was im-

posed upon all property in the state, for the payment of interest on bonds, with the exeception of "household goods, silver plate, jewelry and mechanics' and laborers' tools to the amount of five hundred dollars in each household." In *State v. Maxwell,* 27 La. Ann. 722, defendant in error sought to enjoin the collection of a tax, upon the ground that the statute was unconstitutional in exempting from taxation any of the property of the state. The court said:

"This court can not perceive how a taxpayer can justly complain that the levying of a tax is unequal, because some property in the state has been omitted in the assessment, either through inadvertence or because it is supposed to be exempted by an unconstitutional law; for the effect would be the same. Probably there never has been an assessment which embraced *all* the property of the state, but that fact did not render the assessment unconstitutional. When the omission is discovered, the property must be assessed, for the constitution and laws require that all property shall be assessed."

It has been held in this state, that the omission of the assessor to list taxable property does not invalidate the tax levied on other property. *Burlington & M. R. R. Co. v. Saline County,* 12 Neb. 396.

It is further objected that this act provides different rules for ascertaining the value of the franchises of many of the corporations doing business in this state; that, in some instances, a tax is imposed upon the gross receipts of the corporation in lieu of an *ad valorem* tax levied upon the value of the franchises of other companies, and that these features of the law are so objectionable that it ought not to be enforced. We are all agreed that under the constitution of this state the franchise of a corporation is regarded as property, and must be assessed and taxed as other property. That the same method of arriving at the value of different classes of property is not pursued or not required by the statute, is not an objection to the law, if equality of taxation is finally attained. The vast varieties of property that exist require different rules for the as-

sessment of different classes, but if the legislature has provided a means by which the assessment, when made, can be equalized, so that no one person or interest is called upon to pay an undue proportion of the public burden, that is all that the taxpayer can demand. It may be true that, by the different rules provided for arriving at the taxable value of the franchises of the different classes of corporations doing business in this state, the franchise of one company may be assessed at a higher valuation than that of another, but, as all corporations are assessed in the county, precinct and city where their business is carried on, it is the business of the county and city boards of equalization to fairly and impartially equalize the valuation of all personal property assessed in their respective jurisdictions, and to raise or lower the same as the justice and equity of the case may require. Whatever directions the law may give to the assessor in valuing the property in the first instance, and whatever result these directions may produce in the assessment of franchises or other property of the taxpayer, the work of the board of equalization is to equalize the valuations made, so that every one, as nearly as that may be attained, shall stand upon an equal footing, and pay an equal proportion of the tax laid, according to the real value of his property. For this purpose, it may compel the attendance before it of any person, with books, records and papers; witnesses may be summoned and an investigation made to discover and redress any wrong or inequality suffered by any party from the work of the assessor. In this way, equality is attained and every interest protected.

Counsel have requested, if we sustain the law, that we shall point out in our opinion the proper manner in which the assessment of certain particular property is to be made, and to give directions as to the special manner in which the law shall be put in force. A court is not an administrative board to direct the officers appointed to put a law in operation, and direct the particular method of procedure, in advance of any controversy actually existing.

When a controversy arises and the question is properly before us, then, and not until then, can we undertake to determine it. It was stated in argument that something like three hundred cases had been brought to this court involving questions arising under the old revenue act. The questions which may arise under this, or any revenue act that could be passed, are innumerable, but, until they are brought here in a proper proceeding and we have had the benefit of argument and examination, we can not undertake a duty, which the law itself imposes upon those appointed to administer it, or lay down rules in advance of any controversy for the enforcement of the provisions of the law. It is sufficient, at this time, to say that no objections to the law have been raised, of such serious import as to require us to declare the whole act unconstitutional. As a whole, we believe the law to be a good one, and to have been framed with the object of reaching all property in this state, and to impose upon all taxable property its due share of the public burden. That it may fail in some instances does not require us to condemn it as a whole, and the writs applied for are accordingly denied.

WRITS DENIED.

The following opinion was filed in these cases with the opinion of the court:

FILED DECEMBER 16, 1903.

1. Taxation: RETURN. In making a return of his taxable property under the provisions of chapter 73 of the laws of 1903 the taxpayer may deduct from the credits due him all just debts by him owing at the time of such return.

2. Revenue Law: CONSTRUCTION: CORPORATE STOCK. Section 56 of said chapter 73 is a provision, not for taxing the corporations therein named on their capital stock, but for taxing the shareholders on the value of the stock held by them, and requiring the corporation to pay the tax assessed against the shareholders.

3. ———: ———: UNEARNED PREMIUMS. Unearned premiums returned to the insured on the cancelation of a policy of insurance do not constitute any part of the gross receipts of the company by

37

which the policy was issued, and need not be included in its return of gross receipts under the provisions of section 58 of the act.

4. ——: ——: Gross Receipts. The tax imposed on the gross receipts of the insurance companies named in sections 58 and 61 of the act is not in lieu of all other taxes; but such companies should be taxed on any real estate or other taxable property owned by them, the same as other parties.

5. ——: Corporations and Agents: Liability. The law is not objectionable in that it makes a bank responsible for the payment of the tax levied upon the shares of stock held by its stockholders, or an agent for the tax levied on the property of his principal.

6. ——: Gross Receipts. The gross receipts, required by the provisions of section 78 to be returned for taxation by express, telegraph and telephone companies, refers to gross receipts for business done in this state, and does not include receipts for interstate business.

7. ——: Appeal: Jury. It is no objection to the act that, on an appeal from the board of equalization, no jury is provided or allowed on the trial of such appeal.

Duffie, C.

These two cases were argued and submitted together. The legislature, at its last session, passed an act to provide a system of public revenue and to repeal certain sections of article VII, chapter 77, Compiled Statutes of Nebraska for the year 1901. This act is known as chapter 73 of the laws of 1903. The legislature, by this act, evidently intended to provide an entire and complete system of taxation; its provisions, in many respects, being a radical departure from the law heretofore in force. The respondent, who is the tax commissioner for the city of Omaha, was proceeding under the provisions of this act to assess the property within said city, being governed in said assessment by the provisions of the act as he understood and construed it. The relators, citizens and taxpayers of the city, have brought these actions, asking this court to award a mandamus commanding the respondent to proceed, in the assessment of the taxable property within said city, under the provisions of chapter 77 of the Com-

piled Statutes of 1901, claiming that the new act is in many of its provisions unconstitutional, and that these provisions were an inducement to the legislature in the passage of the act, and that it should therefore be held inoperative as a whole. That the act may not be symmetrical in all of its provisions, is to say nothing more than can be said of any new revenue measure attempted by any legislative body. A revenue act is a matter of growth, and often requires many amendments and the careful attention of many legislatures, before it can be freed from ascertained defects and imperfections. As was truly remarked by one of the counsel on the submission of the case, the legislature which attempts to formulate a new system of revenue becomes a storm center, where all the conflicting interests of the state meet to secure the protection of their own particular business. All taxable property in this state is directly affected by the system of taxation which may be adopted, and all of the greater property interests are, as a rule, seeking to press upon the legislature such measures as will be most favorable to them. Under these circumstances, it is not surprising that in the act now under consideration may be found some matters to which objection may be made, and, taking into consideration the fact that no act ever yet devised has been found equal to the equitable distribution among the property holders of the state of the burden of taxation, it would be still more surprising if the present act were one in which perfect equity, with all classes of property and every business interest in the state, was attained.

Section 1, article IX of our constitution, is as follows:

"The legislature shall provide such revenue as may be needful, by levying a tax by valuation, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property and franchises, the value to be ascertained in such manner as the legislature shall direct, and it shall have power to tax peddlers, auctioneers, brokers, hawkers, commission merchants, showmen, jugglers, inn-keepers, liquor dealers, toll bridges, ferries, in-

surance, telegraph and express interests or business, vendors of patents, in such manner as it shall direct by general law, uniform as to the class upon which it operates."

Section 4 of said article is as follows:

"The legislature shall have no power to release or discharge any county, city, township, town or district whatever, or the inhabitants thereof, or any corporation, or the property therein, from their or its proportionate share of taxes to be levied for state purposes, or due any municipal corporation, nor shall commutation for such taxes be authorized in any form whatever."

The principal objections urged against the act are that, in many of its provisions, it conflicts with these two sections of the constitution, in that uniformity is not preserved in the taxation of certain business interests, and that, in many cases, property which should bear its fair proportion of the tax escapes altogether. It is manifest that where a tax is to be levied by valuation, uniformity and equity in the valuation of the property of the individual or corporation must be preserved; and it is further evident that any law, which sanctions the exemption from its share of the public burden of any class of taxable property, would be an evasion of section 4 of the constitution above quoted. In considering the objections raised and discussed, the rule which also obtains, that the judiciary will not declare an act of the legislature unconstitutional unless it is clear that it infringes upon the fundamental law, must be kept in view. This rule is so well known, and so universally recognized, that a citation of authorities is unnecessary, and especially should this rule be fully observed in construing the provisions of a revenue law; and, unless it is impossible to avoid it, a general revenue law should never be declared inoperative in all its parts because a particular part, relating to a distinct subject, may be invalid. A different rule might be disastrous to the financial operations of the government and produce the utmost confusion in the business of the entire country. 1 Cooley, Taxation (3d ed.), 464; *Field v. Clark*, 143 U. S.

649, 696; *State v. Poynter*, 59 Neb. 417. Section 1 of the act in question contains a definition of the words and phrases used therein. First, it defines the term "real property and real estate." Second, the term "personal property." Third, the word "property," which is defined to include "every kind of property, tangible or intangible, subject to ownership." Fourth, the word "money" is defined as including "all kinds of coin, all kinds of paper issued by or under authority of the United States circulating as money, whether in possession or deposited in bank or elsewhere." Fifth, the word "credit" is defined to include "every demand for money, labor or other valuable thing, whether due or to become due." Section 12 of the act provides, among other things, that "all property in this state not expressly exempt therefrom, shall be subject to taxation, and shall be valued at its actual value, which shall be entered opposite each item and shall be assessed at twenty per cent. of such actual value." One objection made to the law is that it requires the listing for taxation of all "credits" due to the individual taxpayer or mercantile and other corporations or partnerships, whereas by the provisions of section 56 of the act the stockholders of a bank are taxed only upon the value of the shares thereof.

By the provisions of section 27, article I, chapter 77, Compiled Statutes of 1901, the law formerly in force, it was provided that in making up the amount of credits which any person is required to list for himself or for any other person, company or corporation, he shall be entitled to deduct from the gross amount of credits the amount of all *bona fide* debts owing by such person, company or corporation to any other person, company or corporation for a consideration received, and, as there is no provision in the act under consideration for deducting the amount of the taxpayer's indebtedness from the amount of his gross credits, it is said that the law, if literally construed, would operate to ruin many of the business interests of the state, aside from compelling such taxpayers to contribute an undue proportion of the revenues required to be raised as

compared with banking and some other interests. Instances are cited where wholesale and other merchants are indebted for a large proportion of the stock carried. At the same time, their books show credits due them from retail merchants and customers for amounts approximating the value of their stock. These merchants, under this construction, would be taxed upon their goods in stock as tangible property, although they were largely indebted for such stock, and, at the same time, they would be taxed for the amount due them on account of goods sold to retailers and patrons and not yet paid for; whereas the banks of the state, or rather the stockholders of such banks, are taxed upon the value of the shares by them owned, while the money on hand, notes and bills receivable, and all other credits of the bank are not subject to taxation. This argument may be true in part, but not altogether so. If a bank has a capital stock of $100,000 fully paid in, and $100,000 reserve, and $50,000 of undivided profits, the stock of such a bank would, under ordinary circumstances, be worth $250,000 in the market, and a tax upon the shares of stock would be a tax not only upon the capital invested but upon the reserve and undivided profits as well. The amount of cash on hand and evidences of debt held by the bank for money loaned would not, of course, be represented in this assessment for taxation, but, in a practical view of the situation, the money on hand, aside from the reserve and profits undivided, would be money due depositors, the legal title to which is in the bank, it is true, but which, in equity, is the property of those who made the deposit. We think, however, that the word "credit" as used in this act may be fairly said to mean "net credit." In section 58 of the act the legislature speaks of the "gross receipts" of insurance companies, and in section 77 of the gross receipts of express, telephone and telegraph companies, and there are other indications that the legislature used the word "gross" when intending to include the whole of any particular item; and it is fair to presume that, in speaking of credits, especially with the practice heretofore in vogue in

this state of taxing only net credits, the words "gross credits" would have been used had it been intended by the legislature to require the taxpayer to pay on all of his credits without deducting therefrom his *bona fide* indebtedness. But even in the absence of the language used, authority is not wanting in support of the view that the legislature, in providing for the taxation of credits, meant net credits. The constitution of Indiana authorizes the law making power to "provide by law for a uniform and equal rate of assessment and taxation," and that it "shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, excepting such only, for municipal, educational, literary, scientific, religious or charitable purposes, as may be specially exempted by law." The legislature of that state, in providing for the taxation of credits, provided, as did our former law, that the taxpayer might deduct from his gross credits all *bona fide* indebtedness due from him to other parties. In *Florer v. Sheridan,* 137 Ind. 28, the point was made that the act, so far as it allowed a deduction of debts from gross credits, was unconstitutional in that credits were property and the constitution required the taxation of all property. The supreme court said:

"Credits are, by the constitution, property, and as such are to be taxed. Their just value is to be ascertained by subtracting *bona fide* indebtedness from the gross amount of the notes, accounts and other choses in action, and the balance is to be returned as belonging to the individual. Surely, the difference thus found is the precise amount and just value of the credits of the party in the legal and proper sense of the term. Section 1, article 10, of the constitution of Indiana, does not say the gross amount of all notes, accounts and other choses in action shall be taxed, and we can not so construe it without perverting its language and obvious meaning. Consider for a moment its practical operation under such a construction. A has an account against B for $1,000, or a debt against him for a like amount, evidenced by a promissory note. B holds

an account or promissory note, evidencing a *bona fide* indebtedness against A for the same sum of money. Equity, except where one of the parties is insolvent, treats these claims as compensating each other. Neither owes nor could recover, in an action against the other, and yet, if appellant's theory is right $2,000 must be placed upon the tax duplicate, because the holders never met and settled or surrendered their claims. In such case, each is a chose in action held by the party to whom it belongs, and must, under the contention of counsel, be returned to the assessor, and yet it is obvious that neither as against the other has a penny of credit either in money or just value. If the owner is taxed upon such credit it is upon fiction. The tax duplicate, in this way, would be increased, but not from property of value in the state. We think the constitution requires that property, wealth, substantial values, shall be taxed, but not imaginary values. As against an insolvent maker, the true value in money of the credit can only be taxed and so it is where a man has both credits and debts, if there is no balance there is no sum of money due, however large the items of account upon each side may be."

We are entirely satisfied with this exposition of the meaning of the word "credit" as found in the act under consideration, and can not bring ourselves to believe that it was the intention of the legislature to tax what is aptly and properly denominated by the Indiana court as a "fiction." The following cases may also be cited as supporting this construction: *People v. Hibernia Bank,* 51 Cal. 243; *Bank of Mendocino v. Chalfant,* 51 Cal. 369; *Treasurer of Fayette County v. Bank,* 47 Ohio St. 503.

Referring again to the method provided by section 56 for the taxation of banks, it is evident that all property of the same kind or class should be taxed in the same manner. There are numerous banks in this state of the class known as national banks. These banks are authorized and chartered by the national government. By the law of their creation their capital stock can not be taxed, but the in-

dividual shareholders may be taxed upon the value of the shares held.    Section 56 provides that the president, cashier or other accounting officer of every bank or banking association, loan and trust, or investment company, shall, on the first day of April of each year, make out a statement under oath showing the number of shares comprising the actual capital stock of such bank or company, the name and residence of each stockholder, the number of shares owned by each, and the value of said shares on the first day of April, and shall deliver such statement to the proper assessor; that such capital stock shall, thereupon be listed and assessed by him, and return made, in all respects the same as similar property belonging to other corporations and individuals.    It further provides that in case the bank shall have real estate or other tangible property which is assessed separately, then the assessed value of such real estate or tangible property shall be deducted from the valuation of the capital stock of such association or company, and that the assessor shall determine and settle the true value of each share of stock after an examination of such statement, and that in case of national banks an examination of the last report called for by the comptroller of the currency may be made, and in case of state banks the last report called for by the state banking board.    Provision is also made for further examination by the assessor, if the report is not satisfactory to him.    The last clause of the section is as follows: "Such asociation, bank or company shall pay the taxes assessed upon its stock and shall have a lien thereon for the same."    This clearly contemplates an assessment, not upon the capital stock of the bank itself, but upon the value of the shares held by the stockholders and against the stockholders. This is the only method in which a revenue may be derived from national banks.    It is the only procedure authorized by the laws of the national government.    It surely can not be made an objection to this act that other banks and banking associations are taxed in the same manner and method provided for the taxation of national banks.    Neither is

it an objection that the bank is required to pay the tax due from its shareholders. The supreme court of the United States, in *National Bank v. Commonwealth of Kentucky,* 9 Wall. (U. S.) 353, in considering a similar provision in the statutes of Kentucky, said:

"If the state of Kentucky had a claim against a stockholder of the bank who was a nonresident of the state, it could, undoubtedly, collect the claim by legal proceeding, in which the bank could be attached or garnisheed, and made to pay the debt out of the means of its shareholder under its control. This is, in effect, what the law of Kentucky does in regard to the tax of the state on the bank shares. It is no greater interference with the functions of the bank than any other legal proceeding to which its business operations may subject it, and it in no manner hinders it from performing all the duties of financial agent of the government."

This, we think, is a full answer to the objection made, and we speak of it here because another objection to the law is that it requires the agents of insurance and other companies to pay the tax levied upon property of their principals in their possession or under their control, and makes them personally liable therefor. The agent or other party holding property of a nonresident may be made personally liable by being garnisheed, and that the act contemplates that such agent should keep in his possession money of his principal sufficient to discharge the tax against his property, can not, in our opinion, be urged as an objection against this law. As was said by justice Miller in the case last above referred to:

"The mode under consideration is the one which congress itself has adopted in collecting its tax on dividends, and on the income arising from bonds of corporations. It is the only mode which, certainly and without loss, secures the payment of the tax on all the shares, resident or nonresident; and, as we have already stated, it is the mode which experience has justified in the New England states as the most convenient and proper, in regard to the numerous wealthy corporations of those states."

Section 58, refers to fire insurance companies organized under the laws of any other state or country. It provides that such companies are to be taxed in the county, town, village and school district where the agent conducts the business, upon the gross amount of premiums received by it for insurance written upon property within the state during the preceding year, "such gross receipts to be taken as an item of property of that value, and to be assessed and taxed on the same percentage of such value as other property." Section 61 refers to life, fire or accident insurance companies and surety companies organized under the laws of this state, excepting fraternal beneficiary associations and mutual companies that operate on the assessment plan, having no capital stock, and making no dividends, and whose scheme of insurance does not contemplate the return of any percentage of earnings or profits to the policy holders. These domestic companies are also to be taxed in the county, town, city, village and school district, where the agent conducts the business, upon the gross amount of premiums received for all Nebraska business done within the state during the preceding calendar year, less the amount of such receipts ceded to other companies as reinsurance through regularly authorized agents in this state, and less premiums returned on canceled policies. The objection to these sections is that foreign companies are to be taxed upon their gross receipts, whereas domestic companies are exempt from taxation on such part of their gross receipts as has been used for reinsurance through agents operating in this state, and upon the amount of such premiums returned on canceled policies. All property in this state is, by the constitution, required to be taxed by valuation so that every person and corporation shall pay a tax in proportion to the value of his, her or its property and franchise. It must be conceded that property, whether belonging to the citizen or nonresident, must be equitably valued for taxation. When dealing with the taxation of property the legislature can not discriminate in favor of the resident against a nonresident. Each

are to be treated alike, and each is to pay a tax in proportion to the value of his property.

The question whether unearned premiums actually refunded upon canceled policies constitute any part of the gross receipts of an insurance company, was before the supreme court of Illinois in the *German Alliance Ins. Co. v. Van Cleave,* 191 Ill. 410, and it was held that such returned premiums were not to be counted as gross receipts. Under our statute the insurer has a right, at any time during the life of his policy, to surrender it to the company and demand the return of the unearned premium. It is apparent, therefore, that all policies issued are upon the condition that they may be canceled at any time on demand of the person insured and that, in such case, the unearned premium must be returned. In the case referred to, the court, in dealing with the argument made in support of the proposition that gross premiums included premiums returned on canceled policies, said: "According to the argument which would include premiums returned on canceled policies, if an insurance company should issue a policy and receive a premium and at once cancel the policy and return the premium it would have done the amount of business represented by the policy and the amount received would be a premium for insurance business done. We do not think the language used will bear that construction. The merchant would not think of including in the gross receipts of his business any sales of goods with the privilege of return on the part of the purchaser, where they are in fact returned. In such a case there is in the end no sale and no business done, in any proper sense. So in the case of an insurance policy for a definite period with an agreement that it may run any portion of that period and then cease; if the policy is canceled and the insurance ceases there is no insurance business for the remaining portion of the period. The premiums returned are not paid as a liability of the insurance company or as a charge or expense of conducting the business, but because one party or the other avails of the option and terminates the insurance."

We are entirely satisfied with the reasoning and with the holding that unearned premiums returned to the insurance companies on canceled policies can not be included in the term "gross premiums," and that foreign insurance companies, in their report required by the provisions of section 58 of the act, are not required to include such returned premiums as a part of their gross receipts. So far, then, we do not think that there is any discrimination made in favor of domestic companies.

A general objection is lodged against sections 58, 59, 60 and 61 to the effect that, by taxing the gross receipts mentioned therein, all other property that may be owned by the companies named is exempt from taxation, and therefore their provisions are unconstitutional. It is to be observed that no mention is made of any exemption in either of said sections. No mention is made of any property other than the gross receipts. In this respect these sections are very different from the provisions of the Weaver law which the court declared unconstitutional in *State v. Poynter,* 59 Neb. 417, as that law expressly exempted all personal property from taxation except the gross receipts from premiums received. This, as we understand, was one of the main reasons for holding the law invalid. The sections under consideration simply provide that the gross receipts shall be taxed, under certain conditions, and say nothing about other property. These sections, taken in connection with other sections of the law, in our opinion, require insurance companies to list all their property, both real and personal. We do not think it can be consistently claimed that because section 58 makes no mention of real estate, the consequence of such omission is to exempt from taxation the real property of the companies named in that section which is held by them in this state. There is no requirement that all the law relating to the taxation of real and personal property should be contained in any one section of a statute. Section 12 of the act declares that "all property in this state, not expressly exempt therefrom, shall be subject to taxation"; and section

29 declares that "personal property, except such as is required in this chapter to be listed and assessed otherwise, shall be listed and assessed in the county, precinct, township, city, village, and school district where the owner resides, except that property having a local situs, like grain elevators, lumber yards, or any established business, shall be listed and assessed at the place of such situs." This section further provides: "The capital stock and franchise of corporations and persons, except as otherwise provided, shall be listed and taxed in the county, precinct, township, city or village, and school district where the principal office or place of business of such corporation or person is located within this state."

It is evident therefore, from a reading of section 29, that the words "assessed" and "taxed" were used in interchangeably by the legislature and were intended to express the same meaning. It may be true that, in listing and assessing the personal property of insurance companies, the particular mode or scheme of such assessment is not given, but this, we do not understand, can be urged as an objection to the law. It has been the custom, heretofore, for the legislature to provide general rules for the assessment of property, but this was undoubtedly because the assessment is committed to a large number of persons, whose judgment as to the value and method of arriving at the value of property would naturally differ in many radical respects, if no general rules were provided by the legislature, and these rules were undoubtedly adopted with a view to arriving at a more equitable and uniform valuation of all the property in the state, and not because it was deemed necessary to provide these rules in order to make the assessment valid, or the tax laid on such assessment a valid tax. The failure of the legislature to provide specific rules for the valuation of all or any part of the property in this state can not, we think, be held to be an objection to the law.

The other features of the law to which objection is made are contained in sections 16, 55, 67, 78, 122, 124 and 188.

Section 16 gives the agent, or one holding property in a representative capacity, and to whom the property is assessed, a lien upon the property of his principal in his possession for the amount of the taxes, to indemnify against the payment thereof; or, if he has paid the taxes, until he is reimbursed therefor. This is a copy of section 140 of the old law which we are asked to reinstate, but, aside from this, we can see no objection to the law on constitutional grounds. By the common law an agent has a lien on the property of his principal for all expenditures, losses sustained, services in and about the property or thing entrusted to his agency, whenever they are proper or necessary or incident thereto. A similar law was sustained by the supreme court of Iowa in *German Trust Co. v. Board of Equalization of the City of Davenport,* 121 Ia. 325, and *Heinz & Fisher v. Board of Equalization of the City of Davenport,* 121 Ia. 445.

Section 78 provides for the taxation of the tangible property of express, telegraph and telephone companies, and, in addition thereto, upon the gross receipts of such companies for the year next preceding the first day of April in which the tax is levied. The objection to this is that it is a taxation of interstate commerce, as the receipts of such companies arise largely from the transaction of interstate business. The presumption obtains that the legislature intended to pass a constitutional law, and, in this view of the case, the gross receipts of these companies must be limited to include only the gross receipts arising from business transacted in this state. This view of the case is supported by *Ratterman v. Western Union Telegraph Co.,* 127 U. S. 411, and *State v. United States Fidelity & Guaranty Co.,* 98 Md. 314. The state board of equalization can prepare schedules to meet this construction, so that the law may be easily carried out.

Sections 122, 123 and 124 relate to the equalization of valuations, and to appeals from the decision of the equalization board. The particular objection urged is that the taxpayer can not have a jury on the trial of an appeal.

It is sufficient to say, in answer to this objection, that it was within the discretion of the legislature to award an appeal or not at its pleasure, and that no constitutional objection can be sustained to a law denying a jury trial in appeal cases, where the appeal itself might be denied.

Section 188 is substantially the same as section 174 of the law heretofore in force, and which the relator seeks to have reinstated. Any objection which obtains to this section would certainly obtain to the law which he desires to have enforced.

KIRKPATRICK and LETTON, CC., concur.