## THE NATIONAL LIFE INSURANCE COMPANY

*v.*

## THE METROPOLITAN LIFE INSURANCE COMPANY.

*Opinion filed February 21, 1907—Rehearing denied April 3, 1907.*

1. APPEALS AND ERRORS—*Appellate Court is only required to recite the ultimate facts.* In reversing without remanding, in accordance with section 87 of the Practice act, the Appellate Court is only required to recite the ultimate facts as found by it, and not the evidentiary facts from which the ultimate facts are deduced.

2. SAME—*what finding by the Appellate Court is sufficient finding of facts.* A finding in the judgment of the Appellate Court that a certain policy of re-insurance "was canceled by mutual agreement" of the parties prior to the death of the insured and that the defendant's "liability therein terminated by such cancellation," is a finding of ultimate facts and is not merely a conclusion of law.

3. SAME—*effect where Appellate Court recites facts.* Where the Appellate Court reverses without remanding and recites its finding of the ultimate facts in its judgment, the Supreme Court may determine whether the law was correctly applied to the facts as found and may examine the evidence to ascertain whether there is any evidence tending to sustain such finding, but it has nothing to do with the weight of such evidence.

4. CONTRACTS—*when cancellation of re-insurance policy is based upon consideration.* Cancellation of a re-insurance policy by one insurance company at the request of another, whereby the former waives its right to make demand for the premium, is based upon consideration, even though slight.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

Appellee sued appellant on a policy of re-insurance issued by the Iowa Life Insurance Company of Chicago, and assumed by appellant, on the life of Joseph R. Edwards, for $5000. Appellant pleaded as a set-off a policy of re-insurance issued by the Covenant Mutual Life Insurance Company, and assumed by appellee, on the life of George C. Hall, for $5000. Subsequent to the issuing of these policies the Iowa disposed of its business to appellant, the latter assuming the risks of the Iowa, including the policy of re-insurance issued to the Covenant on the life of Edwards. The Covenant disposed of its business to appellee, which latter company assumed all the risks of the Covenant, including that of the policy of re-insurance on the life of said Hall. September 17, 1902, Edwards died, and the Metropolitan, as successor of the Covenant, paid the amount due on his life policies of $10,000 and furnished proofs of his death to the National, demanding payment of the $5000 re-insurance issued by the Iowa, and assumed by the National, on the life of said Edwards, which payment was refused. October 2, 1901, said Hall died, and the National, as the successor of the Iowa, became liable on and paid his policy of $10,000. The Metropolitan, as the successor of the Covenant, became liable to pay the National the amount due on the $5000 policy of re-insurance issued by the Covenant, and assumed by the Metropolitan, on the life of said Hall, provided the policy of re-insurance remained in force and effect at the time. The Metropolitan insists that said policy of re-insurance was not in force, as it had been canceled at the request of the National prior to Hall's death. The National concedes its liability on the $5000 re-insurance on the life of Edwards, but claims as a set-off that appellee is responsible for a like amount upon a policy of re-insurance issued upon the life of Hall and assumed by appellee.

The first premium on Hall's policy was due September 9, 1897. The premiums from that time on were paid, within the terms of the policy, up to and including the year 1900.

Some time in August, 1901, the Metropolitan, as successor of the Covenant, forwarded to the National, as successor of the Iowa, in accordance with the terms of the contract of re-insurance between the original companies, the receipt for the premium due by the terms of the Hall policy September 9, 1901. September 17 the receipt thus forwarded was returned to the Metropolitan with the word "Lapse" written with blue lead pencil across its face. The evidence shows that the cashier of appellant, now deceased, wrote said word and returned the receipt to appellee. It is claimed by appellant that he did this without authority. Appellee claims that the record shows that the cashier had authority to return the receipt so marked, and that other receipts had been returned under similar conditions, sometimes with an accompanying letter and sometimes without any letter, from the office of appellant company, as to other policies of re-insurance, in like manner as to the Hall policy. When the receipt as to the Hall policy was received, so marked, by appellee company, one of its employees, Charles E. Pilling, wrote September 17, 1901, "N. G." on the receipt and marked the Hall policy lapsed on the company's books, writing the letter "L" after the entry and drawing a line through the amount of the premium. Pilling testified that the letters "N. G." meant no good, and that "L" meant lapsed, and that after so marking the receipt he turned the matter over to the cancellation division of the appellee company for cancellation.

Said Hall died October 2, 1901, and on October 8, 1901, the National mailed to the Metropolitan a check for $54.32, the amount of the premium due by the terms of the re-insurance policy on Hall's life on September 9, less commission. This appears to be the first communication of any kind which the Metropolitan had received from the National with reference to the return of the receipt which was marked "Lapse." Upon receipt of this check appellee wrote appellant, October 11, as follows: "We are in receipt of your favor of the 8th inst. inclosing check for $54.32 in payment

of premium on policy No. 18,432 (C. M.) Geo. C. Hall. The renewal receipt for this premium was returned by you last month for cancellation. Kindly advise us whether or not you are desirous of reviving this policy." To this letter the National replied on October 15, 1901: "Your favor of the 11th inst. is at hand, and in reply we beg to inform you that we received notice that Mr. George C. Hall died on October 2, 1901, and we forwarded to you check for the annual premium on your re-insurance policy No. 18,432, in pursuance of paragraphs 4 and 5 of the re-insurance contract entered into between the Covenant Mutual Life Insurance Company and the Iowa Life Insurance Company, dated the first day of May, 1896. Mr. Hall's death occurred before the expiration of the time during which payment of premium can be made on your policy. Our policy for $10,000 was in force on Mr. Hall's life at the time of his death. We will forward duly certified copy of proofs of death as soon as we receive the same."

Sections 4 and 5 of the agreement of May 1, 1896, referred to in the above letter, are as follows:

"4. Renewal receipts shall be forwarded by the company accepting the re-insurance to the company insuring, before the first day of the month during which the said renewals are payable, and the renewal premiums shall be payable twenty days after demand in writing, such demand not to be made before the first day of the month following the month during which the premiums are payable. * * *

"5. Payment as provided in the preceding paragraph shall be deemed equivalent to payment on the day on which the same became due, and in all such cases the company receiving the money shall be bound by any death on which the original company is bound, notwithstanding the re-insurance premium shall not have been paid at the time of death."

To the letter of October 15 appellee replied on October 18, 1901: "We are in receipt of yours of the 15th inst. *in re* policy 18,432, (C. M.) Hall. We would thank you to

advise us wʰ ʼ the premium on your policy was paid. If paid whe⁻ why was our renewal receipt returned for cancellation? paid after due date, was it accepted subject to evidence of good health, and can you furnish us with a copy of the application for restoration of the policy? Kindly advise us of the exact status of your policy at the date of the death of the insured." This letter was replied to October 23, 1901, by appellant, as follows: "Your favor of the 18th inst. *in re* your policy No. 18,432, George C. Hall, is at hand and noted. In reply we beg to inform you that the register or premium-paying date of our policy on Mr. Hall's life is August 28. The annual premium on his policy, due August 28, 1901, was paid to this office on August 24, 1901. Through an error, the renewal receipt under your policy, which you had forwarded to us for collection or payment, was returned to you before the expiration of the time allowed us in the re-insurance contract within which to make payment of the premium. No instruction was ever forwarded by this company to you to cancel the same. We are pleased to hand you herewith duly certified copies of proofs of death which have been furnished us in this case. These proofs have been examined and favorably passed upon by our general counsel, and the claim was to-day approved for payment by our finance and executive committee, as is evidenced by certified copy of its resolution enclosed herewith. It is our intention and desire to make prompt settlement of this claim, and to that end we especially request that you give the matter attention at the earliest possible date and oblige." Appellee, on October 25, 1901, replied: "We return herewith the papers sent us with your favor of the 23d inst. relating to our policy No. 18,432, covering the life of George C. Hall, together with your check sent in an earlier communication as the premium on this policy due September 9. We fail to find in the re-insurance agreement any provision compelling us to revive a policy without the customary evidence of good health in a case like the one under

consideration, where you have voluntarily brought about the cancellation of the policy by the return of the renewal receipt. The paragraphs quoted by you do not, in our judgment, apply to this case." This closed the correspondence between them on this subject.

It appears that the chief office and place of business of the Covenant was in St. Louis, Missouri, and the chief office and place of business of the Iowa was in Chicago, Illinois. The re-insurance policies under the contract of May 1, 1896, were issued and were applied for entirely by correspondence, including the Hall policy. It is claimed by appellant that the Hall re-insurance policy had a net value on October 9 of $5.42, and that three-fourths of this net value, under the agreement of insurance, should be applied to the payment of premium, and would carry the policy thirty-six days, or to and including the 15th day of October, 1901; that this policy was a Missouri contract, and that the laws of Missouri would control as to its forfeiture or cancellation.

The cause was submitted to the court without a jury, and the court held, among other things, as propositions of law, that the Hall policy of re-insurance was in force at the time of the death of Hall and that appellee was liable thereon, and that under the contract of re-insurance the time within which appellant had a right to pay the premium of 1901 had not expired at the time of the death of the said Hall. The trial court thereupon entered judgment in favor of appellant for $175, the excess set-off of the Hall policy over the Edwards policy. On appeal to the Appellate Court this judgment was reversed, with the following finding of fact: "And the court, upon the allegations and proof in the record in this cause contained, doth find that the policy of re-insurance issued by the Covenant Mutual Life Insurance Company of St. Louis, Missouri, to the Iowa Life Insurance Company of Chicago, on the life of George C. Hall, September 9, 1897, and assumed by appellant, was canceled by mutual agreement of appellant and appellee prior to the death

of said Hall, and appellant's liability therein terminated by such cancellation;" and further found that the Metropolitan was entitled to recover from the National the sum of $5000, with interest from October 1, 1902, in all $5946.68, on its re-insurance policy on the life of Joseph R. Edwards, deceased. Appellant thereupon brought the case by appeal to this court.

L. A. STEBBINS, for appellant.

HOYNE, O'CONNOR & HOYNE, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Appellant insists that the finding of fact by the Appellate Court is not such a finding as is contemplated by section 88 of the Practice act; that the finding is really a conclusion of law and not of an ultimate or controlling fact. It contends that among the other things found as ultimate facts in this case should have been the answers to the following questions: (*a*) "Was the return of the receipt with the word 'Lapse' written thereon equivalent to a request to cancel?" (*b*) "Was there any consideration for any supposed cancellation?" (*c*) "Did the Metropolitan ever accept any supposed proposition to cancel?" (*d*) "Did the Metropolitan ever communicate any acceptance of any supposed proposition to cancel?" (*e*) "Was the unearned premium returned or tendered?" (*f*) "Did the cashier who returned the receipt have any authority to return it?" (*g*) "Was the contract in question a Missouri contract?" (*h*) "Did the policy in question have a net value?" (*i*) "If it had a net value, did such net value carry the policy beyond the date of the death of Hall?" (*j*) "Did the Metropolitan, by demanding proofs, waive its right to insist upon this supposed forfeiture?"

A review of the numerous decisions of this court as to what are ultimate facts as applying to a statement of the

Appellate Court, and as to whether such facts are properly stated, will show that this subject is not entirely free from difficulty. What is a legal and sufficient statement of the ultimate facts must depend largely upon the pleadings and evidence of each case. A general rule has frequently been laid down by this court, but the difficulty has always arisen in applying the rule to a given state of facts and pleadings. In the recent case of *Martin* v. *Martin,* 212 Ill. 301, we reviewed the authorities and discussed at length the principle that must govern in these matters, and we there said (p.309) that the Appellate Court, in its finding of facts, "should not find the evidentiary facts and that it should not find conclusions of law, but should find the ultimate controlling facts." We have held that there may be conclusions of fact or inferences drawn from subordinate or evidentiary facts; that the ultimate facts, when considered with reference to the facts or evidence by which they are established or proved, are the logical result of the proofs, or, in other words, conclusions of fact; that the Appellate Court, on the finding of facts different from the lower court, "is only required to recite in its order or judgment of reversal the ultimate facts in issue, as made by the pleadings or the conclusion of such ultimate fact or facts from the evidentiary facts. Such recital of ultimate facts must include or cover all the material issues made by the pleadings vital to determine a right of recovery." (*Caywood* v. *Farrell,* 175 Ill. 480.) In *Brown* v. *City of Aurora,* 109 Ill. 165, some phases of this question were fully discussed, and it was there stated that the Appellate Court was not required to recite in its final order the evidentiary facts, as that would practically amount to reciting the evidence in the case, and that the legislature never intended a recitation of all the subordinate facts, but only the ultimate or issuable facts upon which the case turned. The following are some of the cases where this court has discussed and applied the law on this subject: *Williams* v. *Forbes,* 114 Ill. 167; *Hawk* v. *Chicago, Burlington and*

*Northern Railroad Co.* 138 id. 37; *County of LaSalle* v. *Milligan,* 143 id. 321; *Hawk* v. *Chicago, Burlington and Northern Railroad Co.* 147 id. 399; *Purcell Co.* v. *Sage,* 189 id. 79; *Purcell Co.* v. *Sage,* 192 id. 197; *Purcell Co.* v. *Sage,* 200 id. 342; *Martin* v. *Martin,* 202 id. 382; *Davis* v. *Chicago Edison Co.* 195 id. 31.

If all the evidentiary facts were required to be set out in the finding of the Appellate Court, the carrying into effect of the law would be very difficult and burdensome. Neither was it intended that this court should be compelled (in order to decide whether or not the finding of fact was sufficient) to review and consider all the evidence in the record.

The briefs of appellant in this case have raised the question as to evidentiary and ultimate facts in such a manner as to require this court to examine the entire record with fully as great care as would have been necessary had the case, under the law, come direct to this court without first having been passed upon by the Appellate Court.

Are not the answers to the ten questions heretofore quoted that appellant insists shall be in the Appellate Court's statement of the finding of ultimate and controlling facts, in reality facts subordinate or evidentiary to the ultimate and controlling fact found by the Appellate Court,—*i. e.,* that the policy of re-insurance in question was canceled by mutual agreement between appellant and appellee prior to the death of said Hall, and appellee's liability therein terminated by such cancellation? Admitting that all of these questions must have been legally considered by the court in order to reach a proper conclusion in this case, is it not clear that everyone of them is substantially covered and answered in the finding of facts set out by the Appellate Court? If so, then, under the decisions heretofore cited, the only question for our consideration is whether or not the facts found and recited in the judgment justify the judgment of the Appellate Court. (*City of Spring Valley* v. *Coal Co.* 173 Ill. 497.) "Such finding [of the Appellate Court] is final and conclu-

sive upon this court, and all that we can do is to determine whether, upon the facts so found, the law has been properly applied." (*Aachen and Munich Fire Ins. Co.* v. *Crawford,* 199 Ill. 367). The law doubtless requires this court to examine the evidence so far as to find whether there be any competent testimony which, with all reasonable inferences, fairly tends to prove a controverted fact. *Illinois Steel Co.* v. *Olste,* 214 Ill. 181.

Appellant insists that there is no evidence in the record to justify the conclusion as to the ultimate fact found by the Appellate Court on many, if not all, of the questions heretofore quoted, and which it urges must be considered and decided in order to reach a fair decision of this case. Let us briefly consider the evidence as to these questions.

It is argued that there is nothing in the record to justify the conclusion that the word "lapse" in this transaction was used as equivalent to "cancel." A careful reading of the testimony of witnesses Pilling and Cahen shows that both of these witnesses testified that these terms were sometimes used in insurance matters as synonymous, and the evidence tends strongly to show that both the appellee and appellant companies, in their dealings with each other under their re-insurance contract, not only in this case but in other cases, had used the word "lapse" to mean "cancel." If the rescission of the contract may be implied from circumstances and the conduct of the parties, as it doubtless can be, (*Evans* v. *Jacobitz,* 72 Pac. Rep. 848; *Wehrli* v. *Rehwoldt,* 107 Ill. 60;) then, without question, there is evidence in the record that fairly tends to uphold the conclusions reached by the Appellate Court, not only as to question (*a*), but as to questions (*c*), (*d*) and (*e*).

Appellant insists, not only in the original but in the reply brief, that the receipt returned by the cashier, Wetherell, was without authority, and that Wetherell never had jurisdiction over the re-insurance policies and never returned other receipts. This contention is not borne out by the rec-

ord. Appellant's general manager, Sackett, first stated in his testimony that Wetherell had no authority to return the receipt in question marked "lapse" and had never returned any other, but on being shown a letter signed by Wetherell, dated January 6, 1906, discussing insurance policies between appellant and appellee, in which occurs the sentence, "this insurance having *lapsed* on our books we would ask that you cancel our re-insurance with you," he was compelled to admit that Wetherell had exercised that authority and had authorized the cancellation of certain other policies.

It is plain from this record that if the policy was canceled, as contended for by appellee, then it would make no difference whether or not the contract was a Missouri contract or whether the policy in question had a net value, or, if so, whether such net value would carry it beyond the date of the death of Hall. If this policy was canceled, (and it could be if proper steps were taken, whether it was made under the Missouri law or the law of any other State,) these last questions would not be material.

We cannot agree with appellant's contention that there is no evidence in the record justifying the conclusion of the Appellate Court that the Metropolitan, by demanding proof, as shown by the letters quoted in the statement, did not waive its right to insist upon the alleged forfeiture.

The primary and chief insistence, however, of appellant is, that there was no evidence in the record that would justify any conclusion by the Appellate Court that there was a consideration for the cancellation of the re-insurance contract. Appellant has covered pages of its briefs,—original, reply and supplemental,—with a discussion of this subject. If a valid consideration were required in order to authorize a cancellation of the insurance policy in question, then, if there is any competent evidence in the record that fairly tends to support the conclusion that there was a consideration for the cancellation, it would not be pertinent for us to inquire how slight that consideration. (*Williams* v. *Forbes, supra.*) In

*Sea Ins. Co.* v. *Johnston,* 105 Fed. Rep. 286, it was held that the mutual release from an old contract is an adequate consideration. The performance of the act of cancellation by appellee at the request of appellant, and the withholding of further demands or attempts to collect the new premium, might be urged as adequate consideration. The Appellate Court held that when appellant returned the receipt in question marked "lapse," it in effect refused to pay the renewal premium and asked for cancellation and thereby waived its rights to renew and extend the policy, and that when appellee accepted such waiver and canceled the policy the agreement was consummated; that "each agreement was in consideration of the other." In the state of the record we must approach the discussion of the question of consideration as if it were admitted that both companies had agreed to cancel the policy in question. Under the agreement for re-insurance, appellee, when it sent its receipt for the premium, was entitled to have an answer as to whether the policy was to be re-insured. If no such answer came, appellee could, under the agreement, cut off all right to re-insurance by making a demand for such premium at least twenty days before October 20, 1901. When the receipt was returned marked "lapse," appellee was justified in not making such a demand. Insurance companies are in business to make money. Presumably the primary source of their income is the money paid as premiums by policy holders. The right to receive a premium must be considered a valuable consideration. Even admitting that the appellee company could not compel the appellant company to re-insure on the Hall policy and pay the premium, yet the giving up of this right by canceling the contract in September was giving up a consideration of value, even though slight.

It is also argued by appellee that under the contract for re-insurance appellant would not have the right to re-insure, as to the Hall policy, in any other company unless the Hall policy was canceled with appellee. What is a sufficient con-

sideration depends upon the agreement of parties and may be as various as the human mind. (Hare on Contracts, p. 304.) If the Appellate Court was justified in holding that the contract of re-insurance "was canceled by mutual agreement of appellant and appellee prior to the death of said Hall," the contract of rescission was executed, and in that case consideration would not be an essential part of such an executed contract. Bishop on Contracts, sec. 81; Hammon on Contracts, sec. 315.

Manifestly, from the facts disclosed, appellant company had given authority to its cashier, Wetherell, to take charge of such matters as the canceling of the policy here in question, and in sending the receipt marked "lapse" it was clearly intended to convey the idea to appellee company that there was to be no re-insurance on this policy for the coming year. If Hall had not died on October 2, 1901, there would have been no dispute. After his death, when appellant found it was responsible for $10,000, it endeavored to nullify the return of the receipt marked "lapse" by sending on the check for the premium of the Hall policy for the ensuing year. If, as the Appellate Court has held, this policy had actually been canceled, appellant company could not then revive the extinct policy without the consent of appellee. (*Walters* v. *St. Joseph Fire and Marine Co.* 39 Wis. 489.) We cannot approach the discussion of this subject from the same standpoint as we could had there been no finding of fact by the Appellate Court. As we have shown, there is evidence fairly tending to support the finding of fact by that court. It is not for us to weigh the evidence. The finding of that court, under the law, precludes us from so doing.

Finding no reversible error, the judgment of the Appellate Court must be affirmed.    *Judgment affirmed.*